873 So.2d 538 (2004)
Michele T. PORTER, Appellant/Cross-Appellee,
v.
Todd A. PORTER, Appellee/Cross-Appellant.
No. 1D03-2124.
District Court of Appeal of Florida, First District.
May 21, 2004.
Cindy L. Lasky, of the Law Offices of Ned I. Price, P.A., Jacksonville, for Appellant/Cross-Appellee.
Nancy N. Nowlis, Jacksonville, for Appellee/Cross-Appellant.
BROWNING, J.
The former wife appeals, and the former husband cross-appeals, a final judgment of dissolution of marriage. The former wife contends that the trial court abused its discretion in denying permanent periodic alimony and rehabilitative alimony. The former husband asserts that the court abused its discretion by including the following reservation in Paragraph 4 of the final judgment:

*539 The Court retains jurisdiction to award permanent periodic alimony in the future in a modification action upon the showing of a permanent, material, significant, and involuntary change of circumstances.
Concluding that the trial court decided the issue of alimony based partly on the erroneous imputation of income to the former wife without supporting factual findings and partly on a miscalculation of the amount of equity in the marital residence, we reverse the final judgment in part and remand for reconsideration of the claim for alimony. On remand, the court is instructed to strike the objectionable sentence from Paragraph 4. See Llopis v. Llopis, 731 So.2d 719, 720 n. 2 (Fla. 3d DCA 1999); Roy v. Roy, 522 So.2d 75 (Fla. 4th DCA 1988).
The parties were married in January 1989, had two children, and separated for the final time after 12-1/2 years of marriage. In her counter-petition for dissolution, the former wife sought alimony (temporary, lump-sum, permanent periodic, and/or rehabilitative), inter alia. She requested sole interest and exclusive ownership and possession of the marital residence as lump-sum alimony. The fair market value of the marital home was $212,000.00.
The parties enjoyed a comfortable standard of living during the marriage. The former husband was a program manager in the United States Navy. The trial court accepted the figures in his amended financial affidavit listing his respective gross and net monthly incomes as $7,354.87 and $5,286.59. During the marriage, the former husband was promoted from an ensign earning $18,000.00-$20,000.00 a year to a Senior O-4 lieutenant commander earning more than $93,000.00 a year. He was slated for a promotion to O-5, including an increase in base pay, but that was on administrative hold. The testimony indicated that, more likely than not, he would be promoted to commander once the divorce was finalized.
The former wife has a B.S. degree in aerospace engineering, earned in 1987 from the University of Southern California. She worked for McDonnell Douglas as an aerospace engineer until her marriage in 1989 and then as a systems engineer for Lockheed Missiles & Space until the birth of the parties' first child. She also was a reserve officer in the United States Air Force for eight years after college graduation. The former wife testified that her last annual salary amount at Lockheed was in the $33,000.00-$37,000.00 range, whereas the former husband testified that, to his knowledge, the former wife's last annual salary was in the $40,000.00-$45,000.00 range. When the children were born, the former wife became a full-time homemaker and assumed primary responsibility for caring for the children and maintaining the family home. The former husband was the primary wage-earner in the family. The parties mutually agreed that the former wife would not work outside the home until the children (born in February 1992 and August 1997) started school. The former wife's financial affidavit stated that as of November 2002, she was unemployed, earned zero income, and had no pension. Her sole source of financial support during the pendency of the dissolution proceedings was the former husband's temporary support payments.
The former wife testified at the final hearing that having been out of the aerospace engineering field for 10-11 years, she could not return there because she would have to be paid more than a recent graduate in this field, yet she lacked recent experience, technological training, and computer expertise. She believed that her career in aerospace engineering would be *540 over even if she were to earn a master's degree, for she would be overqualified but would not have enough experience. She testified that Boeing had just laid off 30,000 employees and that other employers in the field were cutting back their workforces. She had looked at newspaper and Internet listings for jobs in her field in North Florida and Maryland (where the former husband was transferred after the parties' final separation) and had found none for someone with her particular experience and circumstances. Although Jacksonville had a re-work facility, the former wife testified that the naval base did not have engineers. She was unaware of any available aerospace engineering positions in Jacksonville. She testified that aerospace engineering jobs are located predominantly in California, with a few in the Washington, D.C., area and one small facility in Orlando. When asked whether the average annual pay for engineers is in the $40,000.00-$50,000.00 range or higher, the former wife testified that the salary depends on one's level of experience. She stated that the starting annual salary range is $28,000.00-$30,000.00. On the other hand, the former husband testified that he was fairly familiar with the available jobs due to the aerospace Navy contract work done at his base. He stated that his Internet job search had shown about 144 "hits" for persons with engineering experience, e.g., field space engineering and system integration in Baltimore, Maryland. He said that an Internet "hit" disclosed fewer (about 60) available jobs in the field in Jacksonville, but he had found some general engineering positions available with annual salary ranges of $40,000.00-$80,000.00 for persons with engineering experience.
The former wife testified that she wanted to leave her major field and earn a master's degree either in education or in teaching, with the goal of teaching mathematics and science at the middle-school level. She testified that she would need 70-75 credit hours at a total cost of $9,375.00 to obtain a master's degree in education at the University of North Florida (U.N.F.); or 51-53 credit hours at a total cost of $15,300.00 for a master's degree in teaching at Jacksonville University (J.U.). To enroll in such a program, she would have to obtain a college transcript, take the G.R.E., and apply to and be accepted at a school, none of which she had done as of the date of final hearing. The former wife testified that she would need 2 ½ to 3 years' education at J.U. or close to 4 years' education at U.N.F. because she lacks an undergraduate background in education. She testified that the starting salary for a middle-school teacher in the area was $29,000.00 and was slightly less for an elementary-school teacher. Neither party presented a vocational expert. Assuming three semesters per calendar year, the court found that the former wife could complete the J.U. requirements in four semesters.
The trial court found that the former wife did not have a sincere desire to obtain a master's degree in teaching or education or to become a teacher. The court found that her rehabilitation plan would not provide the former wife with an earning capacity superior to what she already has with her bachelor's degree and significant work experience in aerospace engineering. Given these findings, the court denied rehabilitative alimony.
"In determining whether to award permanent periodic alimony, the court must consider the needs of the spouse requesting the alimony and the ability of the other spouse to make alimony payments." Krafchuk v. Krafchuk, 804 So.2d 376, 381 (Fla. 4th DCA 2001). After discussing the required factors enumerated in *541 section 61.08(2), Florida Statutes, the trial court determined that the former wife is not entitled to permanent periodic alimony either. The court found that the former wife is young (37 years old during the dissolution trial), intelligent, and well-educated, with meaningful work experience. The court found that with the aid of child support, the former wife will be able to maintain the marital standard of living. The court concluded, however, that because her work experience ended years ago, the former wife will require some time to secure employment reasonably commensurate with her education, abilities, and earnings history. The court found that during this transitional period, the former wife will need support separate from, and additional to, child support. The court found that these facts and needs constitute "unusual circumstances" requiring a non-modifiable award of lump-sum alimony, which the court deemed "bridge-the-gap alimony." See Porzio v. Porzio, 812 So.2d 485, 486 n. 1 (Fla. 5th DCA 2002); Bryan v. Bryan, 765 So.2d 829, 831 (Fla. 1st DCA 2000) (acknowledging the purpose of "bridge-the-gap" alimony is to assist the payee spouse's transition from married to single life); Vanbrussel v. Vanbrussel, 710 So.2d 170, 172 (Fla. 1st DCA 1998). The court determined that the former wife needs, and the former husband is able to pay, lump-sum alimony in the amount of $12,000.00, which is to be paid in 12 periodic monthly installments of $1,000.00. Any balance owed in the event of the former husband's death would survive and become an obligation of the estate. See Borchard v. Borchard, 730 So.2d 748 (Fla. 2d DCA 1999). The former wife challenges the denial of permanent periodic alimony and rehabilitative alimony.
In denying permanent periodic alimony, the trial court essentially imputed a current income-earning capacity to her based on 1992 figures and also found that the marital residence had actual, substantial equity in the amount of $79,333.00. As to the former wife's income, the court accepted the former husband's testimony that when the former wife left aerospace engineering work in 1992 to become a full-time homemaker, her annual salary range was $40,000.00-$45,000.00. The court rejected the former wife's testimony that she had earned substantially less in 1992. In so doing, the trial court exercised its authority to resolve conflicting facts. See Hyotlaine v. Hyotlaine, 356 So.2d 1319, 1320 (Fla. 4th DCA 1978). However, by imputing current income-earning capacity to the former wife in the 2003 final judgment based on her 1992 salary earned in California, without conducting a full and proper inquiry about her current employment prospects and making particularized findings, the trial court erred as a matter of law. See LaFlam v. LaFlam, 854 So.2d 809 (Fla. 2d DCA 2003) (concluding that trial court's imputation of income to former wife in amount she had earned when she left work force 13 years earlier was unsupported by competent substantial evidence); Wendel v. Wendel, 805 So.2d 913 (Fla. 2d DCA 2001); Robinson v. Robinson, 713 So.2d 437 (Fla. 2d DCA 1998); Vick v. Vick, 675 So.2d 714, 717 (Fla. 5th DCA 1996) (on mot. for clarif. and/or reh'g) (remanding for trial court to identify with particularity the respective sources of both parties' imputed incomes); Cushman v. Cushman, 585 So.2d 485 (Fla. 2d DCA 1991). Among the "relevant economic factors" to be considered in determining entitlement to alimony are "[a]ll sources of income available to either party." § 61.08(2)(g), Fla. Stat. (2001). In Smith v. Smith, 737 So.2d 641 (Fla. 1st DCA 1999), we stated:
In determining actual income for purposes of awarding alimony, the trial court must set forth factual findings *542 regarding a spouse's probable and potential level of earnings, the source of actual and imputed income, and any adjustments to income.
Id. at 643.
Another factor considered by the trial court in determining the former wife's financial situation was the marital residence. Competent substantial evidence supports the findings that the home had a fair market value of $212,000.00 and a mortgage owed in the amount of $132,667.00. The court construed these figures as yielding an equity in the residence in the amount of $79,333.00. The former wife correctly notes that the analysis should not end there. The court found "there was no testimony regarding whether one or both parties will experience a capital gains taxable event as a result of the sale of the marital home." In fact, the former wife testified without objection that the marital home had been used as rental property when the parties did not reside there, and that because the parties had depreciated the property as a rental one, the penalty for recapturing the depreciation would reduce the equity to around $35,000.00. To the extent that the trial court apparently overlooked this testimony and based the denial of permanent periodic alimony partly on the erroneous assumption that the former wife could obtain a one-half share of the total equity (in the significantly higher amount) if she elected to sell the home, the issue must be reconsidered on remand.
The trial court is instructed 1) to conduct a full and proper inquiry regarding the former wife's current employment prospects before current income is imputed, in accordance with LaFlam and Smith; and 2) to reconsider the matter of equity in the marital residence in light of the former wife's unrefuted testimony, before making a final determination as to whether she is entitled to alimony. The court may receive additional evidence if it chooses. See Askegard v. Askegard, 524 So.2d 736, 738 (Fla. 1st DCA 1988).
We REVERSE the final judgment of dissolution of marriage in part, REMAND the case for reconsideration of the issue of alimony consistent with this opinion, and INSTRUCT the trial court to strike the single objectionable sentence in Paragraph 4 concerning the retention of jurisdiction to award permanent periodic alimony in the future in a modification action. The final judgment of dissolution of marriage is AFFIRMED in all other respects.
ERVIN and DAVIS, JJ. CONCUR.